The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
******************
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the parties at all relevant times.
3. Defendant-employer is self-insured with Inservco as the servicing agent.
4. Plaintiff's average weekly wage at all relevant times was $331.92, yielding a compensation rate of $214.62.
5. In addition to the depositions, the following exhibits and medical records were submitted into evidence:
a. Plaintiff's Exhibit #2, Letter of commendation
b. Plaintiff's Exhibit #3, Memorandum to Joe Pannasch
 c. Plaintiff's Exhibit #5, Plaintiff's description of work
 d. Plaintiff's Exhibit #6, Plaintiff's certificate of course completion
e. Plaintiff's Exhibit #7, Organizational chart
 f. Plaintiff's Exhibit #8, Revised copy of organizational chart
 g. Plaintiff's Exhibit #9, Memorandum to Joe Pannasch
h. Plaintiff's Exhibit #10, Letter to George Seay
 i. Plaintiff's Exhibit #11, Memorandum to security
 j. Plaintiff's Exhibit #12, Civil Action Complaint filed against Guilford County
k. Defendant's Exhibit #1, Job description
l. Defendant's Exhibit #2-6, Personnel forms
 m. Defendant's Exhibit #7, Memorandum to plaintiff regarding aid
 n. Defendant's Exhibit #8-11, Letter of termination and forms
o. Defendant's Exhibit #13, Letter
p. Plaintiff's medical records (21 pp.)
6. The issues for determination are whether plaintiff developed the occupational disease of emotional trauma pursuant to N.C. Gen. Stat. § 97-52, and if so is she entitled to any benefits under the Act?
******************
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a fifty-four year old married woman with a thirty year old son. Plaintiff had two older brothers and a sister. Plaintiff has a family history of depression. Her great-grandmother on the paternal side was institutionalized for life and died in a psychiatric hospital. Plaintiff's first cousin committed suicide. Plaintiff is in her third marriage and had five stepchildren.
2. Plaintiff had a lengthy history of working in security jobs. She worked in the home offices of banks and in an insurance company as well as at airports. Plaintiff came to North Carolina from Buffalo, New York. In North Carolina plaintiff first worked at an airport part-time and then went to work for Service Systems Corporation, a company providing security at R.J. Reynolds. While at the latter job, plaintiff worked at construction gates while R.J. Reynolds did remodeling.
3. Beginning in April 1987, plaintiff was employed as a Security Supervisor I with the Administrative Service Department of Guilford County. Plaintiff was classified as a lieutenant and her duties included supervising contract security personnel for county parking lots and buildings. Her principal duty assignment was the courthouse complex under construction in High Point, North Carolina. The complex included the Social Services building, Public Health, Mental Health and the parking garage.
4. Plaintiff was never a law enforcement officer, per se. She had no powers of arrest and did not carry a gun. Her life was not at risk.
5. In August 1987, plaintiff attained the rank of captain and was promoted to Security Supervisor II. She was required to supervise other security supervisors. She remained so employed until her job termination on 29 January 1990.
6. Prior to her promotion to captain, plaintiff was cross-trained in all elements of the security positions on the High Point site. This training included operation of the parking booth in order that she would be able to train all staff assigned to her in essential functions of the various security posts.
7. Plaintiff's immediate supervisor was Francis Solomon who had the title of Assistant Director of Security. The Director of Security was Joe Pannasch. Pannasch in turn, was responsible to his supervisor, David Granthum. The Assistant County Manager for Guilford County, George Seay was in charge of all county security and was in a supervisory position to plaintiff, Ms. Solomon, Mr. Pannasch and Mr. Granthum.
8. During the course of her employment with Guilford County, plaintiff began to experience job difficulties. Many of plaintiff's difficulties resulted from personality conflicts. When conflicts occurred, plaintiff would go outside the chain of supervision in order to deal with work problems. Plaintiff tended to by-pass her direct supervisors and to contact George Seay directly.
9. During the course of her employment, plaintiff had the perception that her immediate supervisor, Francis Solomon was attempting to harass her and force her termination. Plaintiff went outside the chain of command in order to react to Ms. Solomon. On 7 March 1988, a security guard in High Point charged that plaintiff made a racial slur against him. No adverse job action was taken against plaintiff and the charge was finally dropped due to lack of substantiation. Nevertheless, plaintiff insisted at the hearing that she did not receive support from her supervisors and she continued to go outside the chain of command in dealing with what she perceived to be job issues.
10. In December 1988 the Employee Relations Officer for defendant-employer convened a conference to address numerous problems plaintiff had with respect to her supervisor.
11. Plaintiff was unable to effectively develop and implement procedures and was resistant to accepting constructive criticism from her supervisors. From this point plaintiff alleged the existence of a conspiracy to remove her from her job. The undersigned find no evidence of a conspiracy. Plaintiff's personality conflicts with subordinates and workers are well documented in the record.
12. One of plaintiff's duties with which she experienced a great deal of difficulty was preparation of audit sheets for parking lot revenues. The audit sheets which plaintiff prepared contained numerous errors. She turned in inaccurate money counts to defendant-employer's finance department. In August 1989, defendant-employer's Employee Relations Officer, Mr. Brawley, met with plaintiff and her supervisors and suggested remedial instruction in basic arithmetic to assist plaintiff in the performance of her job duties. Between 2 August and 22 August 1989, Alice Burkholder of the County's Human Relations Office met with plaintiff to discuss plaintiff's problems with the audit as well as her other job difficulties.
13. Plaintiff was transferred by her supervisors to Greensboro to undergo additional cross-training to prepare her for the opening of a pay parking lot in High Point, so that operations in High Point could be as identical as possible to those in Greensboro. Plaintiff perceived her transfer as a diminution of her authority and as punishment.
14. On 12 January 1990, Joe Pannasch instructed plaintiff to turn over her master key to the control room in the High Point Courthouse. The reason for this request was that security operations in High Point had changed and had become a twenty-four-hour-a-day coverage and there were always persons on duty with keys to buildings there. A master key was no longer required. Plaintiff refused to comply with this request. In addition to loudly and belligerently refusing Mr. Pannasch's request, plaintiff retreated to a back room in the security office in an extremely agitated state and indicated that she would be calling her lawyer and her doctor.
15. Plaintiff telephoned Dr. S. Scott Pierson, a psychiatrist with Guilford County Mental Health Department. She related to Dr. Pierson a history of insomnia, diminished appetite, crying spells, low energy, poor concentration and nervousness over problems with her superior. Dr. Pierson agreed to undertake the treatment of plaintiff, prescribed medication and made an appointment to examine her.
16. At plaintiff's request, Mr. Pannasch spoke to Dr. Pierson. Plaintiff then acceded to Mr. Pannash's demands and turned in her key. According to plaintiff, she knew she would be fired at this point.
17. On 29 January 1990, plaintiff was called in for a pre-disciplinary conference, at which time she was informed that she would be disciplined for insubordination, disregard for policies and procedures as well as discourteous treatment of others. Later that day, plaintiff was advised by Mr. Pannasch that she was being terminated effective that day. Plaintiff was informed of her appeal rights under Guilford County Personnel Regulations. She did not appeal the termination.
18. On 31 January 1990, plaintiff sought to collect her final paycheck from Mr. Pannasch. Mr. Pannasch refused to release plaintiff's paycheck until she had turned in her uniforms and equipment. There was an unpleasant confrontation between plaintiff and Mr. Pannasch.
19. Plaintiff contacted Dr. Pierson on 16 January, 22 January, 26 January and 1 February 1990. During her visits she related her medical history.
20. Plaintiff not only had a family history of depression, but also had a personal history of depression. At age nineteen plaintiff was admitted to a hospital in New York City following a suicide attempt from an overdose. She was overwhelmed with the responsibility of being a single mother with a young sick child.
21. In 1975, plaintiff had a recurrence of depression after she had a stillborn daughter and then a therapeutic abortion. She was treated with antidepressants and counseled at that time. In addition, plaintiff's brother was killed in an automobile accident and her husband's youngest son was killed in a house fire.
22. In 1990, plaintiff was grieving over her dead mother and had passive-aggressive traits related to anger she had for her father. In addition, she had severe marital problems and a lack of trust of her husband. The termination of plaintiff's employment also caused her depression subsequent to 29 January 1990.
23. By 12 April 1990, when plaintiff contacted Dr. Pierson, her depressive symptoms were resolved. On 12 July 1990, plaintiff reported some crying spells but did not present to Dr. Pierson again until 27 September 1990. By that time plaintiff had discontinued anti-depressant medication (Prozac) of her own volition. Dr. Pierson found her symptom free of depression in that month. He did request that she return in three months time; however, she did not consult Dr. Pierson again.
24. By December 1990, plaintiff had filed two EEOC claims against defendant-employer. The claims were denied. In January, 1993 plaintiff filed a complaint in a civil lawsuit against defendant-employer alleging harassment and wrongful discharge. The lawsuit was dismissed. Plaintiff's allegations contained within the complaint have never been proven to be correct.
25. Dr. Pierson's assessment in 1995, during his deposition, that plaintiff would not have become depressed in 1990 if it had not been for her treatment at work was based upon the allegations in the civil complaint as presented by plaintiff's counsel. Since the allegations have not been proven by a preponderance of the evidence in any trial or at this hearing, the opinion must be discounted.
26. Plaintiff was not hospitalized for depression until ten months after her termination date of 29 January 1990 when she was admitted to Charter Hospital.
27. While in Charter Hospital, plaintiff was treated by Dr. Reddy. She was admitted on 3 December and remained until 21 December 1990. According to Dr. Reddy, plaintiff's troubled marriage was a continuing major stressor to her as well as the termination from her job.
28. Plaintiff's depression stabilized toward the end of her hospitalization and Dr. Reddy expected that plaintiff would have been able to return to work. However, plaintiff failed to keep subsequent appointments with Dr. Reddy.
29. Dr. Reddy was unable to respond to the question posed by plaintiff's counsel regarding what activated plaintiff's depression since, in addition to stresses at work, plaintiff had a personal history of depression and severe personal problems at the time.
30. Plaintiff was next treated by Dr. Roy S. Clemmons beginning on 7 September 1991. At that time, according to Dr. Clemmons, plaintiff was able to perform work other than security work, including such physical demanding work as cleaning or retail sales jobs. Dr. Clemmons viewed limits on plaintiff's employability as more related to her vision (eyesight) and obesity than to her mental state. Plaintiff treated with Dr. Clemmons until 9 July 1993. Throughout that time period, Dr. Clemmons diagnosed plaintiff as being clinically depressed. He was not aware Dr. Reddy had found plaintiff symptom free in 1990, nor had he viewed Dr. Pierson's records.
31. According to Dr. Clemmons, plaintiff's employment conditions were the "proximate cause" of her depression. Dr. Clemmons testimony is not given great weight due to the following:
 a. Dr. Clemmons relied on the allegations regarding plaintiff's work as set forth in the civil complaint, which allegations have never been proven.
 b. Dr. Clemmons' treatment of plaintiff was much more remote in time from her termination at her work on 29 January 1990 than was her treatment by Dr. Pierson and Dr. Reddy.
 c. Dr. Clemmons never reviewed the medical records of the physicians who had treated plaintiff during the time of her termination from work and her hospitalization for depression.
Thus, greater weight is given to the testimony of Drs. Pierson and Reddy than to the testimony of Dr. Clemmons.
32. Plaintiff has not returned to work since 29 January 1990. She moved first to Massachusetts and then to Rochester, New York. At the time of the hearing, she was not under treatment by a psychiatrist but was still receiving medication from a family doctor in Rochester.
33. Plaintiff's depression was an ordinary disease of life to which plaintiff was predisposed by virtue of genetic probability.
34. Plaintiff's depression was a recurrent depression. Plaintiff had suffered from depression when she was nineteen years of age and attempted suicide. She had suffered from depression again in 1975 due to a variety of problems in her private life.
35. Plaintiff's depression in 1990 was caused by such personal factors as the state of her marriage, her repressed anger and grief as well as stress due to termination from her job.
36. There is no competent, credible evidence of record that plaintiff's job subjected her to an increased risk as compared with the general public of developing depression, emotional trauma or other nervous conditions. Plaintiff's job consisted of routine supervisory duties. Her life was not at risk and plaintiff was not a law enforcement officer. Consequently, she had no powers of arrest and did not carry a gun. There is no competent, credible evidence of record that holding a security supervisor's job would cause plaintiff to have increased risk of developing emotional trauma or depression compared to a person in the general population.
37. Plaintiff did not develop the occupational disease of depression from 1988 to 1990.
38. Plaintiff did not sustain an injury by accident on 29 January 1990 resulting in being disabled from work.
******************
Based upon the findings of fact, The Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff did not sustain an injury by accident arising out of and in the course of her employment with defendant-employer on 29 January 1990. N.C. Gen. Stat. § 97-2. O'Mary v. LandClearing Corp., 261 N.C. 508, 135 S.E.2d 193 (1964). Davis v.Raleigh Rental Center, 58 N.C. App. 113, 292 S.E.2d 763 (1982).Harding v. Thomas Howard Co., 256 N.C. 427, 124 S.E.2d 109
(1962). Sanderson v. Northeast Construction Co., 77 N.C. App. 117,3334 S.E.2d 392 (1985).
2. On 29 January 1990, plaintiff attended a pre-disciplinary conference to explain her actions of 12 January 1990 and in order to resolve other complaints pending against her. There is no basis for treating the disciplinary action of 29 January 1990 as an accident or as a sole traumatic incident causing emotional trauma or depression. Plaintiff does not so claim. N.C. Gen. Stat. § 97-53(13).
3. Plaintiff did not develop an occupational disease on or about 29 January 1990, as the result of her employment with defendant-employer. N.C. Gen. Stat. § 97-53.
4. Plaintiff did not carry her burden of establishing all the elements of an occupational disease claim. Booker v. DukeMedical Center, 297 N.C. 458, 256 S.E.2d 189 (1979). Rutledge v.Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983).
5. Plaintiff did not prove by a preponderance of the evidence that there was a direct causal link between her work as a security supervisor and the development of depression. Booker at 473-74, 256 S.E.2d at 199.
6. In the absence of sufficient evidence that plaintiff was at an increased risk, plaintiff's claim of an occupational disease must fail. Higgs v. Southeastern Cleaning Service, 122 N.C. App. 456,470 S.E.2d 337 (1996). Cross v. Blue Cross/Blue Shield,104 N.C. App. 284, 409 S.E.2d 103 (1991).
7. Stress caused by plaintiff's inability to do her job is not compensable. Cross, Id.
8. Plaintiff has not proven by a preponderance of the competent credible evidence of record that her depression was characteristic of and peculiar to the job of a security professional. Nor has she proven that there were hazards in her job as a security person which contributed to or were significant causal factors in the development of her depression. Moore v.J.P. Stevens and Co., 47 N.C. App. 744, 269 S.E.2d 159, disc.review denied, 301 N.C. 401, 274 S.E.2d 226 (1980).
9. As a result of the fact that plaintiff did not develop an occupational disease, her claim for temporary total disability and for medical expenses must be denied. N.C. Gen. Stat. §97-53(13).
******************
Based on the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
ORDER
1. Since plaintiff did not sustain or develop an occupational injury, her claim for temporary total disability must be and hereby is DENIED.
2. Since plaintiff did not develop a compensable occupational disease, she is not entitled to have defendant pay for medical expenses incurred for treatment of her depression. Plaintiff's claims must and hereby are DENIED.
3. Defendant shall bear the costs.
 S/ __________________________ MARY MOORE HOAG DEPUTY COMMISSIONER
CONCURRING:
S/ __________________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING IN PART AND DISSENTING IN PART:
S/ __________________________ COY M. VANCE COMMISSIONER
MMH:db